(No. 24009.—

BERTHA SCHOLL, *et al.* Plaintiffs in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(THE ALLEN LUMBER COMPANY, Defendant in Error.)

*Opinion filed June 11, 1937—Rehearing denied October 6, 1937.*

PAUL N. HOLTGREVE, for plaintiffs in error.

E. V. CHAMPION, and F. J. LEE, for defendant in error.

Mr. JUSTICE ORR delivered the opinion of the court:

Fred Scholl, employed by the Allen Lumber Company as foreman at its mill in Peoria, was shot and killed, while on his way to work, by a former employee whom Scholl had discharged and who was then seeking re-employment. The arbitrator decided in favor of his widow, the petitioner, and entered an award in her behalf on April 18, 1932. Upon a review, the Industrial Commission set aside the findings and award, and, on *certiorari,* the circuit court of Peoria county confirmed the order of the commission denying compensation. This writ of error was awarded to review that judgment. The sole issue is whether the fatal injury arose out of and in the course of Scholl's employment.

The facts are not in dispute. At the time of his death Scholl had worked for the respondent corporation about two years and was foreman in charge of certain mill work. One Charles Greene had previously been employed by the company and had worked under Scholl's direction. It was part of Scholl's duties, as foreman, to hire and lay off the men at the mill. In the latter part of December, 1930, Scholl discharged Greene. The latter came back to the company office and told them he was going to lose his home unless he was re-employed. They referred him to Scholl, but Greene was not taken back to work. Greene wrote a letter early in January, 1931, to Albert Reush, an officer of the Allen Lumber Company, concerning his re-employment. He followed this up with another letter to Reush dated February 9, requesting a part-time job so he might have a chance to redeem his home. In this letter he said, "There are some peculiarities about Scholl which cause me to believe he had it in his craw against me, but I try not to feel that way as much as I can." A reply from the company to Greene dated February 11, 1931, was as follows:

"Dear Mr. Greene:
"Received your special delivery letter yesterday.
"Regret to learn of your recent misfortune and hope that the future will be much brighter.
"We are beginning to slacken up some in the mill, although we have been going 9 hours with 7 men up until this week.
"In regard to putting you back on upstairs, that rests entirely with the foreman, Mr. Fred Scholl, and you will have to take this up with him.

Yours very truly,
ALLEN LUMBER COMPANY,
AR:MS                                     By..................."

Reush testified that Scholl worked under his supervision; that Scholl's hours of employment were from seven in the morning until five in the afternoon, except Saturday, when he worked only until noon; that Scholl ceased work at noon on Saturday, February 14, 1931, and that Scholl would have had the right to tell Greene to take his tools

and leave the Allen Lumber Company on the Saturday afternoon previous to Scholl's death. It is undisputed that Greene had gone to Scholl's home on this previous Saturday afternoon (February 14) seeking re-employment, and when leaving had shaken his fists at Scholl in a threatening manner so as to cause Scholl's wife to step between the men.

On Monday morning February 16, between 6:00 and 7:00 o'clock, Greene met Scholl a short distance from the latter's home, on the route to the mill of the Allen Lumber Company, and invited him into his automobile. Greene testified that his sole motive in meeting Scholl that morning was to force the latter to put him back to work at the mill. He said he had a gun with him with the idea of bluffing Scholl or forcing an agreement. Soon after this, and while a number of blocks distant from the Allen Lumber Company, Greene shot and killed Scholl. Further details of the shooting and subsequent events are not material, although it appears that Greene was convicted of murder and sentenced to the penitentiary soon afterward. He was brought, as a prisoner in custody, to testify as a witness for petitioner at the hearing before the arbitrator.

We have repeatedly held that the Workmen's Compensation act should receive a liberal construction. Where, as here, compensation is claimed for accidental death and the facts are not in controversy, the issue whether the deceased received injuries which arose out of and in the course of his employment becomes, from the facts stipulated and proved, a question of law. (*Ervin* v. *Industrial Com.* 364 Ill. 56.) The phrases "arising out of" and "in the course of employment" are used conjunctively. The words "arising out of" refer to the origin or the cause of the accident while the words "in the course of employment" refer to the time, place and circumstances under which the accident occurs. (*Mueller Construction Co.* v. *Industrial Board,* 283 Ill. 148, 152; *Arquin* v. *Industrial Com.* 349 id. 220, 223; Angerstein on Workmen's Com-

pensation, p. 163.) It is not alone sufficient that the injury be received by the employee in the course of his employment but it must also arise while he was acting within the duties of his employment or in some act incidental thereto. (*Vincennes Bridge Co.* v. *Industrial Com.* 351 Ill. 444; *Pittsburg Coal Co.* v. *Industrial Com.* 323 id. 54.) A well accepted statement of when an injury may be said to arise out of the employment is found in *Mazursky* v. *Industrial Com.* 364 Ill. 445, 449, and cases there cited, as follows: "It 'arises out of' the employment, when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." This principle was approved in *Vincennes Bridge Co.* v. *Industrial Com. supra; Taylor Coal Co.* v. *Industrial Com.* 301 Ill. 548; *Central Illinois Public Service Co.* v. *Industrial Com.* 291 id. 256, 265. No fixed rule can be established to determine exactly when an injury arises in the course of employment. In this line of cases, however, we have invariably held that the accident must

have had its origin in some risk connected with or incidental to the employment, so that there was some causal relationship between the employment and the injury. Disagreements and fights arising between employees about their work, which result in injuries or death, may reasonably be termed incidental to the performance of their work. (Angerstein on the Employer and the Compensation act of Illinois, p. 217.) Thus compensation was allowed under varying circumstances, where employees were killed by fellow employees in quarrels or fights, in *Pekin Cooperage Co.* v. *Industrial Com.* 285 Ill. 31; *Franklin Coal Co.* v. *Industrial Com.* 322 id. 23; and *Chicago, Rock Island and Pacific Railway Co.* v. *Industrial Com.* 288 id. 126. In *Taylor Coal Co.* v. *Industrial Com. supra,* compensation was awarded to a foreman who was injured as a result of a quarrel with an employee over the reduction of the latter's wages about three weeks previous to the shooting. In *Clark* v. *Industrial Com.* 356 Ill. 641, compensation was awarded for the death of a garage employee who was killed by gunmen after he had notified the police and testified concerning a stolen car. In all of these cases it appeared that the injury arose out of the employment because it had its origin in the nature of the employment and was incidental thereto.

The undisputed facts in the present case, under the established principles and the above cited authorities, make it clear that the dispute between Scholl and Greene arose out of the employment of Scholl by the lumber company. Greene was not a stranger but was a former employee of the same company, who had recently been discharged by Scholl with the company's knowledge and consent. Prior to this time, the two men had worked together for over a year. The company had employed Scholl as foreman of the mill and had authorized him to hire and discharge the employees, thus clothing him with a measure of executive authority. No restrictions were imposed as to the time and place where such authority should be exercised. In this par-

ticular instance the evidence shows that after approving the discharge of Greene soon after Christmas, in 1931, the company continued to direct Greene to see Scholl about his employment. In answering one of Greene's letters seeking re-employment just a few days prior to the shooting it was said: "You will have to take this up with him." (Scholl). Thus they placed the entire burden and responsibility of Greene's re-employment upon their foreman and expressly authorized Greene to see Scholl about the matter. Under these circumstances it cannot be denied that the relationship between the employment and the injury was definitely established, and that even though the injury was not one that could have been foreseen or expected, it was one which, after the event, is seen to have had its origin in the nature of the employment.

The time, place and manner of the death of Scholl is held up to us as an important distinction, showing that the injury did not arise in the course of his employment. Respondent thus distinguishes this case from many others where fights between employees occurred within working hours and on the premises of the employer. As stated above, no hard and fast rule can be laid down in these cases. In some cases we have held that even though the accident happened on the employer's premises, yet if it occurs while the employee is doing something there for his own personal benefit, it does not arise out of and in the course of his employment. (*Board of Education* v. *Industrial Com.* 321 Ill. 23; *Mazursky* v. *Industrial Com. supra*, and cases cited.) On the other hand, we have frequently allowed recovery under the act for injuries received at some distance from the employer's plant, where it was shown that at the time and place of the injury, the employee was doing some work connected with or incidental to his employment. *Porter Co.* v. *Industrial Com.* 301 Ill. 76; *Irwin-Neisler & Co.* v. *Industrial Com.* 346 id. 89; *Porter* v. *Industrial Com.* 352 id. 392.

The evidence warrants our conclusion that Scholl came to his death because his employer had burdened him with the sole responsibility of Greene's discharge and re-employment. It is true that the shooting occurred away from the employer's plant and not during regular working hours. If Greene had applied for re-employment to foreman Scholl at the mill and there shot him, little or no doubt would exist that the death arose in the course of Scholl's employment. Likewise, under the evidence, it is admitted that if Greene had shot Scholl when he visited his home on Saturday afternoon, February 14, it would have been considered that Scholl was then under its directions, in the course of his employment. Under these circumstances, we believe the employer is equally liable for compensation where the death of Scholl occurred after he had left his home for work, slightly before 7:00 o'clock on Monday morning, February 16. The point is not so much where or when the shooting actually occurred as it is that, at that particular time Scholl, by reason of his employment, and in the performance of a duty arising therefrom, was subjected to an unforeseen risk which brought about his death. It was not necessary that the fatal injury should have been foreseen or expected, since, after the event, it may be clearly seen to have had its origin in the nature of the employment. *Taylor Coal Co.* v. *Industrial Com. supra.*

We are satisfied from the record in this case that the injury which resulted in Scholl's death arose out of and in the course of his employment. The order of the circuit court, confirming the Industrial Commission, is therefore reversed and the cause is remanded to that court, with directions to set aside the finding of the commission and to enter an award in favor of the petitioners in accordance with the original award of the arbitrator, all of which award is now due and payable.

*Reversed and remanded, with directions.*