(No. 31614.—

LOYOLA UNIVERSITY, Plaintiff in Error, *vs*. THE INDUS-
TRIAL COMMISSION *et al.*—(RICHARD DROHAN, Defend-
ant in Error.)

*Opinion filed January 18, 1951.*

B. S. QUIGLEY, and VOGEL & BUNGE, both of Chicago, (KENNETH H. HANSON, of counsel,) for plaintiff in error.

JAMES H. TURNER, of Chicago, (CHARLES D. SNEWIND, of counsel,) for defendant in error.

Mr. JUSTICE WILSON delivered the opinion of the court:

Richard Drohan filed with the Industrial Commission an application for adjustment of claim against Loyola University for injuries sustained on October 28, 1946, as the result of an accident allegedly arising out of and in the course of his employment. An arbitrator awarded compensation for temporary total incapacity for forty-four weeks, an additional sum for a fifty per cent permanent loss of the use of claimant's right leg for ninety-five weeks, and a further sum for necessary first aid, medical, surgical and hospital expenses. The Industrial Commission heard additional evidence and sustained the arbitrator's award. The superior court of Cook County, in turn, confirmed the decision of the Industrial Commission. We have allowed the employer's petition for writ of error for a further review.

There is but little, if any, dispute as to the essential facts. For two or three years prior to October 28, 1946, Drohan had been employed by Loyola University, hereafter referred to as Loyola, as a kitchen man and dining-room helper in the cafeteria. His duties as a kitchen helper consisted of working in the kitchen, washing dishes, and helping the chef. His usual hours of employment in this capacity were from 6:30 A.M. until 1.30 P.M., and a second shift of three hours from 4:30 P.M. to 7:30 P.M. Every other week, according to Drohan, two of the six kitchen helpers worked straight through from 10:30 A.M. to 7:30 P.M. His compensation was $150 per month and board and room on the university's premises. On the day of the accident,

October 28, 1946, Drohan stated that his duties were to have commenced at 10:30 A.M. and continued until 7:30 P.M. There were six rooms for employees in the power-house, located on the university's campus, about one block from the cafeteria where Drohan worked. He occupied a room on the second floor of the powerhouse. Drohan testified that he was subject to call day or night if needed, stating, "I was always available twenty-four hours a day." His principal duty, apart from his duties as a dishwasher in the community kitchen, according to Father Barry, super-intendent of buildings and grounds at Loyola, consisted of "a little odd job" of obtaining newspapers for faculty mem-bers at the nearby newsstand on Sheridan Road at the Loy-ola "L" station.

Relative to the flexibility of Drohan's work and his working hours, Father Barry testified that the university preferred him to be on the grounds for the reason that his working hours were subject to change at any time and because, in October, 1946, "working men were unsatisfac-tory in general, someone might quit his job and we could call on a steady man living on the premises;" that the uni-versity authorities thus felt free to call upon him at any time, although they did not expect to do so since "There would be no occasion to call on him. But if the necessity had presented itself I would have done so. That was my reason for keeping him on the premises." The witness testified, further, that Drohan was merely required to per-form his full day's work and was then free to come and go as he pleased; that the purpose of having him reside on the premises was to make him available for work; that if a person did not live on the premises and had to present himself early in the morning and work until late at night, he probably would not be satisfied; that experience demon-strated employees were more content when on the prem-ises, and that it had proved more satisfactory to have them living there. Father Barry testified that, although he and

other authorities wished to feel free to call Drohan at any time, they did not expect him to respond through any obligation, and that, in the event an emergency should arise, it was worth something to the university to have him on the premises. He added that the work in the university "was not as in a factory like where a person punched a time clock. If he came a little sooner or a little later there was no quarrel raised. He could leave a little earlier, according to the nature of the work, sometimes it was heavier sometimes it was lighter."

In the rear of and adjoining the powerhouse on the north side was an inclined ramp used by trucks to deliver coal. A concrete drive ten feet wide running east and west was at the rear of the powerhouse. A wall stood on the north side of the drive. The top of the ramp was eight or nine feet above the ground. A small areaway immediately to the north of the ramp extended to a wire fence about two feet high which marked the north edge of the university's property. A parapet or protective wall about six inches high extended along the north side of the ramp. A sidewalk ran along to the west of the powerhouse out to Sheridan Road. The window of Drohan's room on the second floor of the powerhouse opened out to the ramp itself. Somtimes, when leaving his room, Drohan would make a shortcut through the window instead of using the stairway provided for the purpose.

October 28, 1946, fell on Monday. Drohan had just returned from a fourteen-day vacation the preceding Saturday although, as previously stated, he was not back at work and did not expect to report until 10.30 A.M. At about 6:20 or 6:25 A.M., he fell from the ramp approximately nine feet to the areaway immediately to the north of the ramp. In the words of the claimant himself, "The accident happened while I was just walking around, killing time before I went to work, walking around, and I stepped on something and slipped and I fell off the ramp. * * *

I fell from the ramp. The distance that I fell was about eight or nine feet. The reason that I fell was that I just slipped. I was walking on the ramp and I stepped on something soft. I don't know what it was. I slipped down off the side of the ramp. I landed on the cement in the alley." Drohan's right leg was broken. The extent of his injury is not controverted. He testified, further, that about 6:25 A.M., he was repairing to the cafeteria to eat breakfast at 8:00 o'clock, saying: "On that particular morning I was not on the way to get a newspaper, I was walking around the grounds, just killing time, waiting for breakfast. * * * I was not in the habit, in order to get a newspaper, or when I was going some place else, of going over that concrete ramp and jumping down that eight feet and cutting through the back yard. This morning I was just walking around the grounds, killing time. I have never jumped off that ramp."

Drohan also testified that the ramp was littered with fragments of coal; that he stepped on the protective wall at the north edge of the ramp, about six inches high, to avoid stepping on the lumps of coal; that there were smaller fragments of coal or coal dust on the wall and that, when he stepped on them, his right foot slipped and he fell from the top of the wall to the areaway below.

The decisive question presented is whether Drohan's injury arose out of his employment. It is firmly established that, in order for an injury to be compensable under the Workmen's Compensation Act, it must arise out of his employment as well as be sustained in its course. The phrases "arising out of" and "in the course of" the employment are used conjunctively. This being so, the two elements must coexist, neither alone being sufficient. In short, they must be concurrent and simultaneous. Proof of one without proof of the other will not sustain an award. (*Ceisel* v. *Industrial Com.* 400 Ill. 574; *Klug* v. *Industrial Com.* 381 Ill. 608; *Scholl* v. *Industrial Com.* 366

Ill. 588.) An injury is received in the course of the employment, it has been said, when it occurs while a workman is doing the duty which he is employed to perform. The words "in the course of the employment" relate to the time, place and circumstances under which the accident took place. (*Illinois Country Club, Inc.* v. *Industrial Com.* 387 Ill. 484.) An accident arises in the course of employment when it occurs within the period of the employment, at a place where the employee reasonably may be in the performance of his duties, and while he is fulfilling those duties or engaged in something incidental thereto. (*Ceisel* v. *Industrial Com.* 400 Ill. 574.) A concession that Drohan's injury occurred within the period of employment and at a place where he reasonably might be in the performance of his duties does not aid him unless, in addition, the injury suffered arose out of his employment. To entitle a claimant to obtain workmen's compensation benefits under the statute, his injury must be of such character that it may be seen to have had its origin in the nature of, or have been incidental to, the employment, or it must have been the result of a risk to which, by reason of the employment, the injured employee was exposed to a greater degree than if he had not been so employed. (*Klug* v. *Industrial Com.* 381 Ill. 608; *Mazursky* v. *Industrial Com.* 364 Ill. 445.) It is not enough that the presence of the injured person at the place he was injured was due to his employment, if the injury is sustained by reason of some cause having no relation to the nature of the employment. *Klug* v. *Industrial Com.* 381 Ill. 608; *Sure Pure Ice Co.* v. *Industrial Com.* 320 Ill. 332; *Boorde* v. *Industrial Com.* 310 Ill. 62.

In *Edmonds* v. *Industrial Com.* 350 Ill. 197, the injured employee was a maid, who had a room on the third floor of her employer's residence and made her home there. She did not work on Saturdays, except that she cooked breakfast. She was permitted to work for other persons during the evenings, principally as a "baby sitter." Preparatory

to leaving her employer's house one evening to do "baby sitting" elsewhere, the employee fell down the stairs leading from the third floor to the second floor. Holding that her accident did not arise out of and in the course of her employment and, hence, was not compensable, this court observed: "It is true that she was injured in the home of her employer but this was also her home. The evidence shows that at the time of her injury she was not engaged in any work which was even remotely connected with her employment by Edmonds. Employees are not in the course of their employment, even though they may be in the general area of it, if they are not engaged in the particular duties for which they are employed or some work incidental thereto." Similarly, in the present case, it affirmatively appears that, at the time of his injury, Drohan was not engaged in any work even remotely connected with his employment by Loyola. It is true, as in *Edmonds* v. *Industrial Com.,* that the employee was injured on the premises of his employer but here, as there, the injured employee was injured while leaving his home. When injured, while walking around on the ramp at 6:25 in the morning of October 28, 1946, Drohan was simply "walking around, killing time." There is no pretense that he was performing any duty whatever for his employer, and he does not so contend. Drohan deliberately placed himself in a dangerous position at a place where he had no duty to perform for, or any occasion to go there on behalf of, his employer.

An analogous situation obtained in *Mazursky* v. *Industrial Com.* 364 Ill. 445, where a laundry driver, after returning with his truck from making deliveries, attempted to repair a tire on his own automobile in the laundry garage. We held that he was not entitled to compensation benefits for injuries while so engaged. Although the accident occurred within the scope of his employment, since it happened during working hours at a place where he was employed to be, it did not arise out of his employment.

The driver was not performing a service for his employer, or acting within the sphere of his employment, but, instead, was performing an act of a purely personal nature in repairing his own car. To the same effect is *Klug* v. *Industrial Com.* 381 Ill. 608.

Drohan contends that the mere fact he was on the premises of his employer subject to its call and ready to do any task which might be required of him renders the injury sustained compensable even though, at the immediate time of the accident, he was not doing any work directly for the benefit of his employer. His theory is that the personal quality of the act causing the injury is unimportant where the relationship of employer and employee requires the latter's presence twenty-four hours a day during which he is subject to call, and where the arrangement of employment is made for the particular benefit of the employer, and that his injury is compensable unless the act he was doing was under extraordinary circumstances wholly unconnected with any incident of his contemplated service. It is true that Drohan lived on the university's property because the employer deemed it an advantage to have him present on the premises. At the same time, the living arrangements were beneficial to Drohan and constituted a part of his compensation. In other words, the arrangement was mutually advantageous. The employee's position, succinctly stated, is that "Being upon the premises waiting to be called and subject to call even though the process be one of 'killing time' is not such an extraordinary circumstance and not so unconnected with any incident of his services as to take him outside the course and scope of his employment. Waiting to be called was one of his duties." The Workmen's Compensation Act has never been construed by this court as applicable to every accident or injury which may happen to the employee during the period of employment, (*Math Igler's Casino, Inc.* v. *Industrial Com.* 394 Ill. 330; *Illinois Country Club, Inc.* v. *Industrial Com.*

387 Ill. 484; *Boorde* v. *Industrial Com.* 310 Ill. 62,) and there is no legitimate basis, upon the factual situation presented, for holding that a person admittedly "killing time" four hours before his regular duties are to commence is so engaged as to render an injury sustained at that time compensable. We do not regard the injury sustained by Drohan as reasonably attributable or incidental to the nature of his employment, or to the condition under which he lived in carrying out his employment. Pursued to its logical extreme, in the case at bar the employer would have been liable for any injury sustained by Drohan at any time during the twenty-four hours of the day, provided only the injury be sustained while on the employer's property. In short, the employer would have been an insurer of the safety of its employee at all times. This is not the law.

The employee places reliance upon cases from other jurisdictions where employees, principally those in domestic service, who were required to live upon their employer's premises, subject to call at any time during the twenty-four hours of the day, recovered compensation for injuries suffered on the premises even though the injuries, in some instances, were the result of activities of a personal and private nature. (*Martin* v. *Plant,* 293 N.Y. 617; *Underhill* v. *Keener,* 233 App. Div. 779, affirmed 258 N.Y. 543; *Carroll* v. *Westport Sanitarium,* 131 Conn. 334; *Doyle's Case,* 256 Mass. 290; *Wilson Cypress Co.* v. *Miller,* 26 So. 2d 441.) Not all of these cases which Drohan denominates the "bunkhouse cases" go so far as to hold that injuries sustained by employees outside of their actual working hours always arise out of the employment. One of the authorities relied upon by the employee, *Finnegan* v. *Biehn,* 276 N.Y. 50, says, "Not all injuries which occur on the premises, however, arise out of the employment. Injuries due to the acts of the employee disassociated from his employment are not compensable." Recovery of benefits under our statute requires that the injury must arise both in the

course of and out of the employment. Again, in *Employers' Liability Assurance Corp.* v. *Industrial Accident Com.* 37 Cal. App. 2d 567, the court said, "The true rule to be derived from the cases is that the injury is compensable if received while the employee is doing those reasonable things which his contract of employment expressly or impliedly authorizes him to do." The test for determining the issue presented is well stated in *Lancashire & Yorkshire Railway Co.* v. *Highley,* AC352, 10 BWCC 241, "Was it part of the injured person's employment to hazard, to suffer, or to do that which caused his injury?"

In *Meehan* v. *Marion Manor Apartments,* 305 Mich. 262, an apartment house caretaker, who received use of the basement apartment as part of his compensation, was accidentally asphyxiated from an open burner on a gas stove in the kitchen of the apartment as he was preparing coffee. Holding that Meehan's accidental death did not arise out of his employment, the Michigan Supreme Court observed, "Deceased was asphyxiated by illuminating gas while preparing coffee. This act was in no way incidental to the employment; the risk he encountered was entirely divorced from it, and was one to which any person might be exposed while performing such an act in his home for his personal enjoyment and comfort. * * * The conclusion reached is not altered because of the fact that the accident resulting in death occurred in the building where the employment was performed. Deceased received the use of his apartment as a part of the compensation for his services as caretaker. It was his home and it cannot be said that acts of a personal nature, usually performed as a part of family life, became incidental to the employment because living quarters were furnished in consideration of the services performed. The accident that occurred is no more compensable than it would have been had it occurred in a home occupied by deceased some distance from the apartment house, his place of employment."

In *Brusven* v. *Ballord,* 217 Minn. 502, the injured employee was a chambermaid in a hotel who was furnished board and room in her employer's hotel as part of her compensation. She lost her balance while standing on a chair to close the window in her room at a time when she was not on duty nor subject to call. Holding that her injuries did not arise out of her employment, the court said, "The furnishing of sleeping accommodations to employe as part of her compensation did not cause or have any bearing on her accident. * * * In the instant case, employe was injured when she lost her balance while standing on a chair to close the window. This was an act done for her own comfort and personal to herself. The accident happened when she was off duty. The moving cause of danger was not 'peculiar to the work' but was 'common to the neighborhood.' It was not 'incidental to the character of the business of the employer,' but 'was independent of the relation of employment.' It does not 'appear to have had its origin in a risk connected with the employment,' and it did not flow from 'that source as a rational consequence.'" *Pisko* v. *Mintz,* 262 N.Y. 176, is to the same effect as *Meehan* v. *Marion Manor Apartments* and *Brusven* v. *Ballord.*

Whether a particular act is reasonably contemplated by the employment is to be determined by considering, among other factors, the nature of the act, the nature of the employment, and the terms of the contract of employment. (*Employers' Liability Assurance Corp.* v. *Industrial Accident Com.* 37 Cal. App. 2d 567.) When so considered, it is clear that the act of walking around "killing time" on an inclined ramp four hours before the employee's regular duties commenced was not an act reasonably contemplated by the contract of employment. Plainly stated, Drohan was a dishwasher and, so far as his employment was concerned, he had no reason to be on the narrow protective wall running along the edge of the coal ramp eight or nine

feet in height at the back of the powerhouse. The ramp was not a part of the premises which would reasonably be used in going to or from the second floor of the building where he lived. The act which resulted in the injury was not reasonably incidental to the employment. The requirement of his employment that he live on the premises of his employer did not contemplate the risk of balancing himself as he walked along the wall on the side of an inclined coal ramp where he had no occasion to be in behalf of his employer but was there, instead, merely waiting, "killing time." In short, there was no causal connection between Drohan's employment and his injury.

The judgment of the superior court of Cook County is reversed and the award of the Industrial Commission set aside.

*Judgment reversed; award set aside.*